**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH GUNTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:13-cv-00010 |
| | ) | |
| HENRY STEWARD, | ) | Judge Sharp |
| | ) | |
| Respondent. | ) | |

<u>**MEMORANDUM OPINION**</u>

Joseph Gunter, a prisoner in state custody at the Northwest Correctional Complex in Tiptonville, Tennessee, has filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1), challenging his conviction in the Circuit Court for Fentress County, Tennessee. The Court previously entered an order denying the respondent's motion for summary judgment on statute-of-limitations grounds and directing the respondent to answer the petition on the merits. The respondent has now filed his answer (ECF No. 35) along with copies of the relevant portions of the underlying state-court record, and the respondent has filed a reply (ECF No. 40). The petition is ripe for review. For the reasons stated herein, the petition will be denied.

**I. PROCEDURAL BACKGROUND**

Gunter was convicted in March 2002 of first-degree felony murder and especially aggravated robbery by a Fentress County Jury. He was sentenced to life imprisonment without parole on the murder conviction and received a twenty-year sentence on the robbery conviction, to be served concurrently with the life sentence. His first attempt to appeal his convictions was dismissed because his motion for new trial was untimely. *State v. Gunter*, No. M2004-01519-CCA-R3-CD, 2005 WL 2662575 (Tenn. Ct. Crim. App. Oct. 19, 2005). Gunter eventually obtained a delayed appeal, and his conviction was affirmed. *State v. Gunter* ("*Gunter II*"), M2008-00675-CCA-R3-CD, 2009 WL 1643441, at *3 (Tenn. Ct. Crim. App. June 12, 2009), *perm. to appeal denied* (Tenn. Oct. 19, 2009).

He filed a state post-conviction petition on August 25, 2010. The trial court denied relief on the merits, and that decision was also affirmed on appeal. *Gunter v. State* ("*Gunter III*"), No. M2011-01530-

SC-R11-PC, 2012 WL 3144631 (Tenn. Ct. Crim. App. Aug. 3, 2012), *perm. to appeal denied* (Tenn. Dec. 11, 2012).

Gunter filed his § 2254 petition in this Court on January 23, 2013. (ECF No. 1, at 15 (petitioner's certification as to the date petition was placed in prison mailing system).) The Court has found the petition to be timely.

## II.  STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals summarized the testimony presented during trial as follows:[1]

> This case involves the bludgeoning death of the defendant's mother, Wanda Gunter, in her Jamestown home. On Sunday morning, February 4, 2001, several of the victim's relatives, concerned because they had been unable to reach the victim all weekend, went to her apartment to check on her. When the apartment manager let them inside, one of them found the victim lying face down in a pool of blood on the floor of her bedroom with a bloody hammer beside her. The subsequent autopsy revealed she had died of blunt head trauma, with at least four separate injuries to her head caused by an object similar to a hammer. Although a number of empty jewelry boxes were scattered throughout the room and it appeared as if the victim's purse had been emptied, the victim's apartment was locked when her family arrived.

> Meanwhile, on the previous day, the twenty-one-year-old defendant, who had been living with the victim, had aroused the suspicions of a Sevierville pawn shop owner by his repeated trips into the store to pawn jewelry. When Sevierville police officers responded to the scene, they found the defendant in another pawn shop nearby while his girlfriend and her children waited in the victim's vehicle parked outside. Initially arrested on an outstanding community corrections violation warrant, the defendant was questioned the next day about the murder and gave an initial statement in which he claimed the victim had planned to spend the weekend with his older brother and his children and had given him permission to borrow her vehicle while she was away. In that statement, the defendant said that the pawned jewelry was part of a collection he had been accumulating over the previous two or three years. However, when later informed that the victim had been found dead in her apartment with some of her jewelry missing, the defendant admitted he had stolen some of her jewelry and said that she had been with a man she had just met from Alcoholics Anonymous when he last saw her on Friday morning.

> Later that day, the defendant, who had been told only that the victim had died of head injuries, gave another statement in which he confessed that he had hit the victim once in the back of the head with a hammer. He insisted, however, that the victim was already grievously wounded from self-inflicted hammer wounds at the time and implied that the blow he delivered was intended to end her suffering. According to the defendant, the victim had cancer, was taking a medication that caused her to hallucinate, and had been acting strangely all week. His statement reads in pertinent part:

---

[1] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

While in the living room, I hea[r]d a pop coming from the bedroom. While I was going toward the bedroom where mom was supose [sic] to be sleeping, I heard another pop and mom trying to say something. As I entered the bedroom, I seen [sic] mom falling toward her right hand side. Mom fell into the dresser.... I seen [sic] mom bleeding from the back of her head toward the left side. She was holding the hammer in her left hand. When she fell, she fell face down.... After she fell, mom was gasping for air. Mom was pooping on herself and farting. Mom was shaking. She had a hold [sic] of the hammer still trying to hit herself. I fell back into the wall between the closet door and bedroom door where I had left the hammer. I remember just seeing flashes. I'm not sure if I passed out or not. I grabbed the hammer from mom's hand. I had to pry her four fingers from around the hammer. After I got it loose from her hand, mom was still moving her hand at her head like she was still trying to hit herself. I took the hammer and hit mom in the back of the head one time. Mom was still trying to gasp for air. I cannot remember if I tossed the hammer or what, but I don't remember coming out of the bedroom with it. I stood there for a minute. I thought I would call my brothers and tell them what had happened but I thought they wouldn't believe me. I hit mom once because she was gurgling and twitching. Her head was pouring blood so bad. I thought I needed to get away. I decided to take mom's car, which she had previously given me the keys to borrow. When I got into the car, the gas hand was almost on "E" for empty. I went back inside the apartment and looked in mom's purse for money. I had gotten the purse from beside her bed. It fell off the bed after I was looking through it for some money. I had previously given $600.00 (five $100 bills and five $20 bills) to her. I didn't find any money in her purse. Instead, I took some jewerly [sic] from mom's jewerly [sic] case on her dresser.

The defendant stated he had stopped at several pawn shops to pawn some of the jewelry in order to obtain expense money for a weekend trip to Pigeon Forge with his girlfriend and her children.

At trial, the defendant acknowledged he had signed the statement but claimed that the words had been supplied and written by the Tennessee Bureau of Investigation ("TBI") agent who conducted the interview. The defendant testified, instead, that he had returned to the victim's apartment after a brief absence on Friday morning to find her "twitching and quivering" as she lay dying on her bedroom floor. He conceded he might have pushed the hammer to the side as he knelt beside the victim but he insisted that he had never hit her with the hammer. The defendant explained that he had taken the victim's jewelry and fled because he feared that he would be blamed for her murder.

In an effort to bolster the defendant's testimony and to create reasonable doubt about his guilt for the murder, defense counsel attempted to show that the manager of the victim's apartment complex, who had since been indicted for the murder of another resident, was the real culprit in the crime. To that end, he elicited testimony from various witnesses, including the defendant, about arguments the victim had been having with the apartment manager over the repair of her apartment's heat pump and the petition that the victim had circulated shortly before her death asking that the manager be replaced. Notwithstanding defense counsel's efforts, the jury convicted the defendant of both especially aggravated robbery and felony murder. The trial court entered the judgments on March 14, 2002, and on May 21, 2004, overruled the defendant's motion for a new trial.

*Gunter I*, 2009 WL 1643441, at *1–3. "Although not referred to in this summary, the defense also

introduced into evidence the clothing the Petitioner claimed to have been wearing when he last saw his

mother and adduced proof that no blood was visible on this clothing." *Gunter III*, 2012 WL 3144631, at *3.

In addition, the trial court explored an issue of juror misconduct that arose during the trial:

On the morning of the second day of trial, the Petitioner observed one of the jurors ("Juror") [Baz] in the dispatch office of the sheriff's department speaking with Detective Ledbetter, who had participated in the investigation of the case and who testified for the State. The Petitioner reported this to his defense lawyer, who reported it to the trial court. The trial court questioned the Juror out of the presence of the rest of the jury, and he admitted to having been in the dispatcher's office with Detective Ledbetter. On further questioning, the Juror stated that he and Detective Ledbetter "didn't discuss nothing as far as the case was concerned, [they] just—no, sir, not anything that would have anything to do with that particular case, no, sir." . . . .

. . . .

After the Juror left the courtroom, defense counsel requested that the Juror be excused from the jury. The prosecutor did not object. Defense counsel then told the court that he was also concerned about any inappropriate communications that the Juror may have imparted to the rest of the jury. The Juror was then returned to the courtroom and the trial court asked him if he had since told the rest of the jury about their previous discussion. The Juror reported that the other jurors had made inquiries, to which he responded that he had been at the dispatcher's office that morning, that he should not have been there, and that he had not realized he was not supposed to be there.

. . . .

The trial court then excused the Juror, and defense counsel requested a mistrial. The trial court took the motion under advisement and then issued a curative instruction to the jury. The trial court eventually denied the defense's motion for mistrial.

*Id.* at *3–4.

The state appellate court summarized the evidence presented during post-conviction proceedings

as follows:

At the hearing on the Petitioner's claim for post-conviction relief, the Petitioner's trial lawyer ("Trial Counsel") testified that he became licensed to practice law in Tennessee in 1997. He began working with the Eighth Judicial District Public Defender's Office, where he remained until 2006. The Petitioner's trial was held in May 2002. In conjunction with representing the Petitioner, Trial Counsel sought and obtained a psychological evaluation of the Petitioner and the services of an investigative firm.

Trial Counsel recalled some clothing being introduced into evidence at the Petitioner's trial. Trial Counsel did not recall any boots being introduced into evidence. Trial Counsel also recalled proof at trial about the crime scene containing a lot of blood spatter and Detective Ledbetter's testimony at trial that he saw no blood on the clothing recovered from the Petitioner. Trial Counsel agreed that a forensic expert might have been able to find blood spatter on the clothing that Detective Ledbetter failed to observe.

Trial Counsel also agreed that, given the circumstances of the killing, it would have been reasonable to assume that the clothing and footwear worn by the perpetrator would have contained blood spatter from the victim. Accordingly, Trial Counsel argued at trial that the absence of blood on the Petitioner's clothing exonerated him. As to why Trial Counsel did not seek funds to have the clothing examined by a forensic expert, Trial Counsel responded:

> [T]he State obviously was not gonna be in a position to say that there was blood on these items, and our position—our feeling about it was that it made more sense to leave it at that and argue that, in fact, there was no blood on the items, that that tended to prove that he was, in fact, not the killer, so we did not want to do a test or some scientific inquiry that may have found blood when in—you know, it didn't appear that there was any. That seemed like the kind of thing that might blow up and cut against us so we didn't do that.

Trial Counsel explained that a forensic examination would reveal one of two results: the presence of blood or the absence of blood. If the examination revealed the presence of blood, then the defense would not have been able to argue that "there's not even blood on his clothes." Had the examination revealed the absence of blood, the defense argument would have been the same as the one actually made: that the Petitioner could not have committed the killing because there was no blood spatter on his clothes.

Trial Counsel acknowledged, however, that, generally, juries may give more credence to expert testimony—such as a forensic scientist testifying that there was no blood on the clothing—than to lay testimony. Trial Counsel nevertheless reiterated the reasons for his decision, made in consultation with the Petitioner, not to seek testing:

> [O]ne of the big problems with the State's case here was this theory that this was an extremely bloody crime scene, there is blood on every piece of furniture, on the floor, . . . basically everything in the room had blood on it—extremely bloody scene. If [the Petitioner] was wearing the clothes that they had at the time he committed this act as they alleged, he would have blood all over those clothes. It would be obvious, it would not be some kind of microscopic thing. . . . [I]t obviously made sense to argue that the fact there was no blood on these items helped us. Because our argument became, okay, you've got the clothes that we were wearing, officer whoever is testifying, you didn't find any blood on any of those clothes, did you, and the officer would say no, and we were in a much better position to argue that without getting some testing that might negate that whole line of argument. I mean, if we did a test and it came back that there was blood on these items, then we can't make any of those arguments.

Trial Counsel added that he "didn't feel like it was in [the Petitioner's] interest to take that chance." Trial Counsel also testified that he did not recall the Petitioner's asking him to have the clothing tested.

On cross-examination, Trial Counsel acknowledged that the Petitioner was arrested a couple of days after the killing. It was the Petitioner who claimed to have been wearing the subject clothing and boots while he was at his mother's residence. As to the possibility of requesting a change of venue or a sequestered jury, Trial Counsel stated that, after discussion, they decided not to pursue either of these possibilities because the Petitioner's "general reputation in the community was positive." Trial Counsel testified, "[T]here wouldn't have been any advantage to either change venue or try[ ] to sequester the jury." Trial Counsel added that they were "able to seat a jury, didn't have any real issues." As to sequestration, Trial Counsel stated that the trial court that tried the Petitioner's case was "very reluctant to grant those kind of motions" and that there did not appear to be grounds for requesting a sequestered jury. He also stated that he had no reason to suspect that one of the jurors might make an inappropriate visit to the sheriff's office during the trial.

On redirect examination, Trial Counsel emphasized that he had not seen the merit or the need in seeking either a change of venue or to have the jury sequestered.

The Petitioner testified that Trial Counsel "never made [him] aware that [he] could have had forensic analysis done on anything prior to [his] trial." He stated that he would

have been willing to run the risk of blood being found on the clothing by such analysis, and that he was still willing to run the risk. He also testified that there were three people that could have testified that the clothing introduced at trial was the clothing he was wearing when he left his mother's apartment. He told Trial Counsel about these persons.FN2

FN2. None of these persons testified at the post-conviction hearing, however.

He also discussed with Trial Counsel the possibilities of requesting a change of venue and a sequestered jury, but Trial Counsel explained that the trial court was normally reluctant to grant such motions and also explained that jurors were typically happier if they were not sequestered. He stated that his jury was tainted by the [juror misconduct], however, and that, had Trial Counsel obtained a sequestered jury, the problem with the Juror [Baz, discussed below] would not have occurred.

The post-conviction court ruled from the bench and determined that Trial Counsel had "made an able argument to the jury about . . . no blood on the clothing" and that, even if forensic testing had been requested and resulted in a finding of no blood on the clothing, it would not have affected the outcome of the trial. The post-conviction court also determined that Trial Counsel had not been deficient in failing to seek either a change of venue or a sequestered jury. Accordingly, the post-conviction court denied relief. The post-conviction court also denied the Petitioner's request for DNA analysis on the basis that such analysis "would not result in exculpatory evidence creating a reasonable probability that the petitioner would not have been prosecuted or convicted."

*Gunter III*, 2012 WL 3144631, at *3–6.

## III.    ISSUES PRESENTED FOR REVIEW

In his present petition, Gunter asserts the following claims for relief, all arising from the alleged ineffective assistance of his trial counsel:

1. That counsel was constitutionally ineffective for failing to move to sequester the jury;

2. That counsel was constitutionally ineffective for failing to investigate the case and to seek expert assistance and independent forensic testing of blood on the petitioner's clothes;

3. That counsel was constitutionally ineffective for failing to seek expert assistance and independent forensic testing of fingerprints at the murder scene, including fingerprints on the hammer that was used as the murder weapon.

4. That counsel was constitutionally ineffective for failing to raise a claim that the evidence was insufficient to support the jury's verdict of guilty for first-degree felony murder and especially aggravated robbery; and

5. That counsel was constitutionally ineffective for failing to move for a mistrial a second time when a juror, Mr. Baz, who was seen having improper communications with a trial witness in the sheriff's department dispatch office was allowed to return to the jury room after questioning.

In addition, in the memorandum filed in support of his habeas petition, Gunter expands on this final claim, alleging that he received ineffective assistance of trial counsel when

> trial counsel failed (1) to object to Mr. Baz returning to the jury room after he had spoken with the state's "key" witness, detective Ledbetter. The Petitioner contends that trial counsel failed again (2) to object to Mr. Baz returning to the jury room [a]fter being questioned by the trial court and trial counsel regarding his contact with detective Ledbetter. Finally, the Petitioner contends that trial counsel was constitutionally deficient when he failed (3) to question or have the Court question Mr. Baz, [a]fter he was dismissed from jury service regarding the conversations he had with the remaining jurors pending his dismissal; (4) failing to move to question the remaining jurors regarding the conversation Juror Baz had with them, and (5) failing to move the court to question detective Gary Ledbetter regarding the conversation he had with juror Baz, and the reason Baz went down to the Sheriff's Office in the first place.

(Habeas Memo. 43–44, ECF No. 2, at 44–45.)

## IV.    ANALYSIS AND DISCUSSION: EXHAUSTED CLAIMS

### A.    Standard of Review of Fully Exhausted Claims

The standard for reviewing properly exhausted claims in an application for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* A state-court decision is an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case. *See, e.g.*, *Cullen v. Pinholster*, 563 U.S. ----, 131 S. Ct. 1388, 1399 (2011); *see also Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) ("A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [this Court's] precedent." (citation omitted)).

The Supreme Court has repeatedly emphasized that this standard is "difficult to meet." *White v.*

*Woodall*, 572 U.S. ----, 134 S. Ct. 1697, 1702 (2014) (quoting *Metrish v. Lancaster*, 569 U. S. ----, 133 S. Ct. 1781, 1786 (2013) (quoting *Harrington v. Richter*, 562 U. S. ----, 131 S. Ct. 770, 786 (2011))). As the Supreme Court stated in *White*:

> "[C]learly established Federal law" for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. An "unreasonable application of" those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. Rather, [a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*White*, 134 S. Ct. at 1702 (internal quotation marks and citations omitted).

Further, this Court must presume the correctness of state-court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

### B.      The Petitioner's Exhausted Claims

All of Gunter's claims are premised upon the alleged ineffective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that, in order to successfully claim that a lawyer's assistance was so ineffective as to violate the Sixth Amendment, a defendant must meet two requirements. "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams*, 529 U.S. at 412; that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

Thus, when a claim of ineffective assistance of counsel is raised in a § 2254 habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 131 S. Ct. at 785. As the Supreme Court clarified in *Richter*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under [the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")], though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* at 786 (internal quotation marks and citation omitted).

Gunter presents two ineffective-assistance claims that were fully exhausted in the state courts: that his trial attorney was ineffective for failing to move to sequester the jury and failing to seek forensic analysis of the clothes he was allegedly wearing at the time of his mother's murder. The respondent concedes that these claims are exhausted.

### 1. Failure to Sequester the Jury

The petitioner insists that his case was a "high profile case involving matricide" that received a significant amount of publicity in a relatively small community. (ECF No. 2, at 8.) Because of the media attention, the petitioner asked his trial attorney to file a motion for change of venue. His counsel refused. The petitioner also asked counsel to file a motion to sequester the jury, since the case had received a lot of media attention in both the newspaper and the local television news channel "that produced undue excitement against the Petitioner." (*Id.*) Counsel refused this request as well. The petitioner insists that his attorney's decision was unreasonable in light of the amount of publicity that the case had generated and in light of the decision not to seek a change of venue. He further argues that the post-conviction court, in finding that the attorney made a strategic decision not to sequester the jury, failed to consider whether the decision was also reasonable.

The petitioner also argues that the decision not to sequester the jury prejudiced him, because it left the jurors "free to go anywhere [they] wanted to go." (*Id.* at 9.) As a result, juror Robert Baz, who had asked during trial if he could submit a question to Detective Gary Ledbetter, a testifying witness, was observed the next morning in the Sheriff's Department's dispatch office having a conversation with Detective Ledbetter. Although the trial judge later dismissed juror Baz, the petitioner insists that because Baz was permitted to go back into the room with the other jurors while the trial court deliberated on whether to excuse him, Baz prejudiced the other jurors against him: "The remaining jurors knew that the

Petitioner had caused Baz's dismissal. The trial judge did not question the remaining jurors to learn what exactly Mr. Baz had told them. At this point, the entire jury panel had already been tainted." (*Id.* at 13.)

In addressing this claim, the Tennessee Court of Criminal Appeals correctly articulated the standard established by *Strickland*, *Gunter III*, 2012 WL 3144631, at *7, and concluded that Gunter "established neither deficiency nor prejudice" resulting from his trial attorney's failure to seek to sequester the jury. *Id.* at *9. The court stated:

> The Petitioner's argument that Trial Counsel should have requested a sequestered jury centers on the Juror's [Baz's] conduct during the trial. Trial Counsel testified, however, that he in no way anticipated such a development. Prior to trial, he made a strategic decision not to seek a sequestered jury, a decision that the Petitioner has failed to prove was based on inadequate investigation or preparation. Moreover, the Juror's conduct was raised on direct appeal and this Court determined that the Petitioner was not entitled to relief on the basis of the manner in which this matter was handled. The Petitioner has failed to demonstrate that he is entitled to post-conviction relief on this basis.

*Id.* The state court's application of the *Strickland* standard was not unreasonable, nor was its conclusion that trial counsel's performance was not deficient. Counsel had no apparent reason to anticipate that one juror would behave inappropriately, and the petitioner's insistence that his counsel was ineffective for failing to move to sequester the jury relies entirely on the benefit of hindsight. The state court's conclusion that the petitioner failed to prove prejudice was also reasonable.[2] The petitioner is not entitled to relief on the basis of this claim.

### 2. Failure to Seek Forensic Testing of Clothing

Gunter argues that his attorney "had a reasonable duty to investigate and seek forensic testing of the clothing . . . , especially, in light of the fact that the Petitioner had always maintained his innocence, and that the apartment manager was an alternate suspect.[3] In rejecting this argument in the context of the petitioner's state post-conviction appeal, the Tennessee Court of Criminal Appeals, again with reference to the *Strickland* standard, held that

> the Petitioner has established neither deficiency nor prejudice as to Trial Counsel's decision in this regard. Trial Counsel made a well-reasoned strategic choice to not take the chance of bolstering the State's proof against the petitioner. Trial Counsel was able to argue, credibly, that the proof did not support the State's theory of the crime. Trial

---

[2] The issue concerning juror Baz is discussed in greater detail below, in Section V.B.3 of this Memorandum.

[3] According to the petitioner, the property manager, Ute Ferrell, was arrested within two weeks of Wanda Gunter's murder, and confessed to the murder of another resident of the same apartments who, along with Wanda Gunter, was working to have Ferrell removed from her position as property manager.

> Counsel's decision not to seek testing did not prejudice the Petitioner. The Petitioner's confession obviously had more of an impact on the jury than did his blood-free clothing.

*Gunter III*, 2012 WL 3144631, at *9.

This Court cannot find that the Tennessee court's decision was contrary to or involved an unreasonable application of the *Strickland* standard, or that it was based on an unreasonable determination of the facts. Trial counsel was questioned on this topic at the post-conviction hearing and testified that he made a conscious, strategic decision not to seek forensic testing of the clothing:

> [T]he State obviously was not gonna be in a position to say that there was blood on these items, and our position – our feeling about it was that it made more sense to leave it at that and argue that, in fact, there was no blood on the items, that that tended to prove that he [the petitioner] was, in fact, not the killer, so we did not want to do a test or some scientific inquiry that may have found blood when in – you know, it didn't appear that there was any. That seemed like the kind of thing that might blow up and cut against us so we didn't do that.

(Post-Conviction Hr'g Tr. at 35:15–24, ECF No. 34-24, at 36.) The attorney specifically testified that he did not believe it was in his client's best interest to take the chance of testing the clothing for the presence of blood: "My assessment was, at best, we would be as well off as we were without the testing and at worse [sic], we would lose that whole line of defense, so there was nothing to gain by doing the testing in my opinion." (*Id.* at 44:9–13, ECF No. 34-24, at 45.)

In other words, the evidence established that trial counsel made a reasoned, strategic decision not to seek forensic testing of the clothing, and there is no evidence in the record that the petitioner was prejudiced by that decision. The petitioner is not entitled to relief on the basis of this claim.

## V.     ANALYSIS AND DISCUSSION: UNEXHAUSTED CLAIMS

### A.     Standard of Review of Defaulted or Unexhausted Claims

Generally, a federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A]

federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once his federal claims have been raised in the highest state court available,[4] the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under AEDPA)).

If, however, an unexhausted claim would be procedurally barred under state law, for instance by a statute of limitations or a state rule barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted (because it was not presented to a state court for review), and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the alleged constitutional errors. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).[5]

Generally, the "cause" standard in procedural-default cases requires the petitioner to show that

---

[4] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

[5] *Coleman* also recognized that a prisoner can overcome a procedural default without showing cause and prejudice by "demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. This exception is not at issue in the present case.

"some objective factor external to the defense impeded counsel's efforts" to raise a claim in the state courts. *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012) (quoting *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (internal quotation marks omitted)). Until recently, a prisoner could not demonstrate cause by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman*, 501 U.S. at 752–53 (holding that attorney error is not cause to excuse a default). That barrier was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted).

However, in *Martinez v. Ryan*, 566 U.S. ----, 132 S. Ct. 1309 (2012), the Supreme Court held that the ineffective assistance of post-conviction counsel can establish "cause" to excuse the procedural default of a defendant's substantial claim of ineffective assistance at trial, but only where state procedural law prohibits defendants from raising such claims on direct appeal and instead requires defendants to raise the claims for the first time in post-conviction proceedings. *Id.* at 1318–19. Less than a year after *Martinez*, the Supreme Court issued *Trevino v. Thaler*, 569 U.S. ----, 133 S. Ct. 1911 (2013). *Trevino* extended *Martinez* to apply to cases where, although state procedural law might permit defendants to raise ineffective-assistance claims on direct appeal, a state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Id.* at 1921.[6]

Applying *Trevino*, the Sixth Circuit Court of Appeals has now recognized that "Tennessee defendants, too, are highly unlikely to have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. March 19, 2014). The court therefore held, based on *Martinez* and *Trevino*, that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial." *Id.* at *7 (citations omitted).

The *Martinez* Court's creation of a narrow exception to the procedural-default bar stemmed from

---

[6] In neither *Martinez* nor *Trevino* did the Supreme Court go so far as to recognize a free-standing right to the effective assistance of counsel at post-conviction proceedings. *See Martinez*, 132 S. Ct. at 1319–20 (characterizing the holding in that case as an equitable one that did not create a 'freestanding constitutional claim [that] would require the appointment of counsel in initial review collateral proceedings").

its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Id.* at 1318. In other words, *Martinez* requires both that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," *see id.* at 1320 ("The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts."), and that the claim be a substantial one. *See id.* at 1318–19 (noting that the prisoner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit").

In addition, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman v. Thompson*, 501 U.S. at 750.

Neither the Supreme Court nor the Sixth Circuit has yet provided guidance as to how district courts reviewing habeas petitions are to implement the rulings in *Martinez* and *Trevino*. In one of the first circuit court opinions to address the issue directly, the Ninth Circuit held that, to establish that his claim is "substantial," a habeas petitioner must "show that his post-conviction relief counsel was ineffective under *Strickland v. Washington*." *Clabourne v. Ryan*, 745 F.3d 362, 376 (9th Cir. 2014). That is, the petitioner must show both that his post-conviction counsel's performance was constitutionally deficient and that the petitioner was prejudiced by the deficiency. *Clabourne*, 745 F.3d at 376. Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [post-conviction] proceeding would have been different." *Strickland*, 466 U.S. at 694. Further, according to the Ninth Circuit, "actual prejudice," for purposes of the *Coleman* analysis in the *Martinez* context, requires a showing that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the claim has some merit." *Clabourne*, 745 F.3d at 377 (quoting *Martinez*, 132 S. Ct. at 1318).

The *Clabourne* court recognized some "overlap" between the two prejudice requirements:

Within the "cause" prong there is an element of "prejudice" that must be established: to show ineffective assistance of post-conviction relief counsel, a petitioner must establish a

> reasonable probability that the result of the post-conviction proceeding would have been different. The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective. The prejudice at issue is prejudice at the post-conviction relief level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different.

*Clabourne*, 745 F.3d at 377-78.

In other words, in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

With these principles in mind, the Court turns to the consideration of the petitioner's remaining claims.

### B.    The Procedurally Defaulted Claims

As set forth above, the petitioner raises a number of claims here that were not fully exhausted in his state post-conviction proceedings, including that trial counsel was ineffective for (1) failing to seek expert assistance and independent forensic testing of fingerprints at the murder scene; (2) failing to raise a claim that the evidence was insufficient to support the jury's verdict of guilty for first-degree felony murder and especially aggravated robbery; and (3) failing to move for a mistrial a second time when Juror Baz was allowed to return to the jury room after questioning. In conjunction with this latter claim, the petitioner also asserts that his trial counsel should have (4) objected to Baz's being allowed to return to the jury room after he had spoken with Detective Ledbetter; (5) objected to Baz's being permitted to return to the jury room after being questioned in court regarding his contact with Detective Gary Ledbetter; (6) questioned Baz more closely about the conversations he had with the remaining jurors when he returned to the jury room after being questioned; (7) filed a motion to question the remaining jurors regarding what Baz told them about his being questioned in court; and (8) filed a motion to question Ledbetter regarding his conversation with Baz.

### 1.    *Failure to Test for Fingerprints*

The petitioner does not acknowledge that that this issue is procedurally defaulted and in fact combines it with his claim, addressed above, that trial counsel was ineffective for failing to seek forensic testing for blood stains on the clothing the petitioner was allegedly wearing at the time of the murder, which was exhausted. The petitioner did raise the fingerprint issue in his initial *pro se* post-conviction brief, where he asserted that "his trial counsel was constitutionally deficient for failing to request any type of forensic or scientific (*fingerprint analysis*) testing of the latent fingerprint on the murder weapon and/or other physical evidence . . . collected from the scene in order to exonerate Petitioner." (ECF No. 34-23, at 22.) Post-conviction counsel incorporated this claim into the amended petition (ECF No. 34-23, at 107) and questioned trial counsel about the issue briefly at the post-conviction hearing (ECF No. 34-24, at 48–49). Post-conviction counsel even included this claim among the issues raised in the post-conviction appellate brief to the Tennessee Court of Criminal Appeals. (ECF No. 34-17, at 4.) In the body of his appellate brief, however, counsel addressed only the issue of whether trial counsel was ineffective for failing to seek DNA testing of the petitioner's clothing and not the issue of his failure to request fingerprint testing of the murder weapon and other items recovered at the crime scene. (ECF No. 34-17, at 31–32 (discussion of "Argument  III").) The Tennessee Court of Criminal Appeals therefore did not address this issue in its opinion. Because the petitioner did not effectively present the issue to the Tennessee Court of Criminal Appeals and is barred by Tennessee law from further pursuing the issue in state court now, the claim is deemed to be exhausted but procedurally defaulted. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002).

As set forth above, *Martinez* requires, as a threshold matter, that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding." *Id.* The claim at issue here was raised during initial-review post-conviction proceedings but was waived at the appellate level. Consequently, it does not fall within the limited exception created by *Martinez* and its progeny, and the petitioner cannot overcome the procedural default of this claim.

Even if that were not the case, and further assuming that the claim of ineffective assistance of post-conviction counsel "has some merit," *Martinez*, 132 S. Ct. at 1318–19, the petitioner cannot establish the actual-prejudice prong of the *Coleman* standard for overcoming procedural default. *See Coleman v.*

*Thompson*, 501 U.S. 722, 750 (1991). That is, he cannot establish a substantial claim that trial counsel was ineffective for failing to seek fingerprint analysis of the murder weapon or other items at the murder victim's apartment or that he was prejudiced by that failure. First, trial counsel clearly determined as a matter of strategy that it would not benefit his client to conduct forensic testing. Instead of seeking such analysis himself, he argued that the State had the obligation to prove its case beyond a reasonable doubt, that the State had conducted no forensic testing, and that there was no forensic evidence available to implicate his client. He made this point repeatedly during his cross examination of the State's witnesses as well as during his closing argument. His testimony during the post-conviction hearing, though vague on the topic of fingerprint testing, established that he did not believe it was in his client's best interest to seek forensic testing that might further implicate his client. Although this strategy ultimately did not succeed, it was not unreasonable.

Moreover, although the petitioner asserts in his memorandum that he argued in state court that, "with respect to the murder weapon, there was a bloody fingerprint on the handle of the hammer" (ECF No. 2, at 24), the petitioner does not point to any actual evidence in the record supporting a conclusion that the hammer had a bloody fingerprint on it. In fact, trial counsel, when questioning TBI agent Charles Scott, specifically noted that he did not "know whether [blood] was on the hammer or not." (Trial Tr. at 249:3–4, ECF No. 34-3, at 124.) Agent Scott testified during the trial that the likelihood of finding a usable fingerprint on the weapon or on other items at the crime scene was very small. (*See* Trial Tr. at 249, ECF No. 34-3, at 124.) Thus, the petitioner's assertion that there was a bloody fingerprint on the hammer appears to be based purely on speculation. As a result, the petitioner cannot establish that he was prejudiced by his counsel's failure to move for fingerprint testing of the hammer or other items at the murder scene.

This claim is procedurally defaulted, and the petitioner cannot establish either the requisite cause or actual prejudice to overcome the default. He is not entitled to relief on the basis of this claim.

### *2.* **Failure to Raise Insufficiency-of-Evidence Argument**

The petitioner claims his trial counsel was constitutionally ineffective for failing to raise, on direct appeal, a claim that the evidence was insufficient to support the verdict. He acknowledges that this claim was not raised in post-conviction proceedings and is therefore procedurally defaulted. He expressly

argues, however, that his post-conviction counsel was constitutionally ineffective for failing to argue that trial counsel was ineffective for not raising a sufficiency-of-the-evidence claim and that post-conviction counsel's deficient performance constitutes "cause" sufficient to overcome the procedural default, in light of *Martinez.*

The petitioner also asserts actual prejudice resulting from the deficient performance insofar as he claims that the underlying evidence failed to establish every necessary element of the charges of conviction, suggesting that such a claim would have been meritorious if it had been raised. Specifically, he asserts that the State failed to present evidence to show that he "ever had any *intent* to take his mother's jewelry [p]rior to, or [c]oncurrent with the alleged act of killing." (ECF No. 2, at 32 (emphasis and alterations in original).) He claims the only evidence regarding the charge of especially aggravated robbery came from his own statement, relied on by the State, that showed that "the taking of the jewelry occurred as an [a]fterthought to the alleged killing once [the petitioner] had already left the residence and got into the car." (*Id.*) He argues on this basis that the theft of the property was a separate and distinct crime from the murder altogether, which would not support a conviction for especially aggravated robbery. Second, he asserts that the evidence was insufficient to support the first-degree murder conviction in his case because "there was never any evidence presented to corroborate his confession." (*Id.* at 38.) He argues that, under Tennessee law, a criminal conviction cannot be based solely upon a defendant's uncorroborated confession.

The Court finds that post-conviction counsel was not ineffective for failing to raise this particular ineffective-assistance claim, because trial counsel was not ineffective for failing to raise the substantive insufficiency-of-the-evidence claim. As summarized by the Tennessee Court of Criminal Appeals in *Gunter III* (quoted above), the evidence showed that the petitioner aroused suspicion because he had made repeated trips to pawn stores to pawn or attempt to pawn a substantial amount of jewelry. When first questioned by police, he signed a statement in which he claimed his mother was spending the weekend with his brother's family and that he was pawning jewelry that he had collected over the course of two to three years. (*See* ECF No. 34-11, at 9–10.) Later, however, he admitted that he had hit his mother once with a hammer, but claimed that she was already wounded by self-inflicted hammer wounds. (ECF No. 34-11, at 19.) He indeed claimed that he decided to take some jewelry only after

finding that he needed gas money and his mother did not have any cash on her. At trial, he retracted his confession, claiming that it was inaccurate. He claimed he visited his aunt that Friday morning. He returned home approximately 45 minutes later to find his mother already beaten and bleeding. He claimed she breathed her last breath "while [he] had a hold of [her]," and that "the only thing [he] kn[e]w to do was grab jewelry and run," because he was afraid he would be blamed for the crime. (Trial Tr. at 504–06, ECF No. 34-5, at 85–87.) His aunt did not testify to corroborate his testimony about his visit, and the jury evidently believed the part of the confession in which the petitioner acknowledged striking his mother with a hammer as well as his trial testimony that he grabbed the jewelry and ran, but rejected the rest of his inconsistent stories. Other evidence corroborated the jury's conclusion that Gunter intentionally killed his mother in the course of robbing her, including the fact that he had told numerous inconsistent stories and that, at the time he was caught, he had with him a substantial amount of jewelry, and he had already made repeated trips to pawn shops to pawn other jewelry. The jury was free to draw its own conclusions from the evidence and to reject those portions of the petitioner's statements that were unbelievable or inconsistent with other facts. *Cf. Gunter II*, 2009 WL 1643441, at *15, *18 (noting that the proof of guilt was "overwhelming").

Regarding Gunter's assertion that a criminal conviction may not be based solely on an uncorroborated confession, the Supreme Court has stated that the government may satisfy this rule if it introduces "substantial independent evidence which would tend to establish the trustworthiness of the statement." *Opper v. United States*, 348 U.S. 84, 93 (1954). In this case, Gunter's initial confession to killing his mother with a hammer-blow to her head was independently corroborated by the fact that the police had, at the time the statement was given, already determined that Gunter's mother had been murdered by means of hammer blows to the head, a fact that they had not yet conveyed to Gunter. The conviction in this case did not violate the corroboration rule.

Because the strength of the State's proof in this case would have defeated any freestanding sufficiency challenge on direct appeal, it now prevents any showing of prejudice under a *Strickland* analysis. Post-conviction counsel therefore was not ineffective for failing to raise this claim, nor can the petitioner establish "actual prejudice" under the *Coleman* standard for purposes of *Martinez*. The petitioner is not entitled to relief on the basis of this claim.

### 3. Failure to Move for a Mistrial a Second Time

Although the petitioner characterizes this claim as based upon trial counsel's "failure to move for a mistrial the second time," his discussion of this claim incorporates at least five other distinct claims, including that trial counsel was ineffective because he failed (1) to object to Juror Baz's being permitted to return to the jury room after he had spoken with the Detective Ledbetter; (2) to object to Baz's returning to the jury room again after being questioned in court about his contact with Ledbetter; (3) to question Baz further about what he had told the other jurors; (4) to move to question the remaining jurors regarding what Baz had told them; and (5) to move the court to question detective Gary Ledbetter regarding the conversation he had with Baz and the reason Baz went down to the Sheriff's Office in the first place. These claims are largely identical to those raised (under a similar heading) in the post-conviction appellate brief filed in the Tennessee Court of Criminal Appeals. That court rejected all the claims without addressing their merits on the grounds that they were waived, not having been raised during initial-review collateral proceedings. *Gunter III*, 2012 WL 3144631, at *8. The petitioner acknowledges that these claims are procedurally defaulted but asserts that post-conviction counsel's ineffective assistance in failing to raise the claims during initial-review collateral proceedings constitutes cause for the default, and that he was prejudiced thereby, so as to overcome the default. He asks the Court to consider the claims on the merits.

The State addresses the petitioner's claim that his counsel was ineffective for failing to move for a mistrial a second time and points out that Gunter's attorney did, in fact, move for a mistrial following Juror Baz's return from the jury room after having initially been questioned in court. The State also argues, with respect to the petitioner's other claims, that the Tennessee Court of Criminal Appeals thoroughly examined the issue surrounding Juror Baz during the delayed direct appeal and concluded that, while Baz's contact with a witness was improper, no prejudice arose from the contact.

Regarding Gunter's principal claim that his trial attorney was ineffective for failing to move for a mistrial after Baz returned to the court a second time and that his post-conviction counsel was ineffective for waiving this claim, the Court agrees with the State that, assuming post-conviction counsel was ineffective, Gunter cannot establish prejudice, because his attorney did move for a mistrial at that particular juncture, which the trial court denied.

As for Gunter's ancillary claims concerning the Baz situation, the Court must first consider whether the petitioner has established that "his post-conviction relief counsel was ineffective under *Strickland v. Washington.*" *Clabourne v. Ryan*, 745 F.3d 362, 376 (9th Cir. 2014). Under the first prong of *Strickland*, the Court finds that post-conviction counsel was, at least arguably, constitutionally deficient insofar as he waived claims he thought important enough to raise on appeal by failing to present them first at the initial-review level. Gunter's claim nonetheless fails, however, because he cannot establish the second prong of *Strickland*: that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [post-conviction] proceeding would have been different." *Strickland*, 466 U.S. at 694.

As discussed above, the analysis of this question necessarily overlaps to some extent with the *Coleman* "actual prejudice" inquiry, which requires consideration of whether "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the claim has some merit." *Clabourne*, 745 F.3d at 377 (quoting *Martinez*, 132 S. Ct. at 1318). The Court finds, in short, that the petitioner's underlying claims of ineffective assistance of trial counsel are not substantial, because the record of trial proceedings conclusively establishes that juror Baz was adequately questioned under oath about his improper conduct, that his misconduct did not taint the jury as a whole, and that the trial court issued a curative instruction, thus avoiding any potential prejudice to Gunter arising from the incident.

The Tennessee Court of Criminal Appeals summarized the evidence presented in the trial court as follows:

> During Gunter's trial, defense counsel told the trial court that Gunter observed Baz talking to Det. Ledbetter, a witness for the State, in the dispatcher's office the morning before the second day of trial. The trial court then told defense counsel that the proper remedy would depend on the remedy defense counsel felt was appropriate. The trial court determined that it was proper to ask Baz about his conversation with Det. Ledbetter, and then defense counsel could request that Baz be excused or could request a mistrial.

> The trial court questioned Baz outside the presence of the other jurors. The court asked Baz if he had talked to Det. Ledbetter about the trial, and Baz responded, "We didn't discuss nothing [sic] as far as the case was concerned, we just—no, sir, not anything that would have anything to do with that particular case, no, sir[.]" Baz said that he asked Det. Ledbetter about the marijuana they had on display in the dispatcher's office. Baz also said that he told Det. Ledbetter that "it was an enjoyment to be there as far as to listen to both lawyers and listen to them talk and stuff[.]" Baz told the trial court that he spent fifteen minutes talking to Det. Ledbetter prior to the second day of Gunter's trial. Baz acknowledged seeing Gunter enter the dispatcher's office. At the conclusion of the questioning, the court told Baz to return to the room where the rest of the jurors were located. After a recess, defense counsel requested that Baz be excused. The State did

not object to Baz's removal from the jury . . . .

Then defense counsel said that his only remaining worry was whether Baz had talked to the other jurors about the questioning by the trial court. The court asked Baz whether he talked to the other jurors about the inquiries made by the court concerning Baz's interaction with Det. Ledbetter, and Baz replied:

> They—some of them asked me, said, you know, did you—were you called on the stand and stuff, and I said no. I said I was—I just—I didn't discuss—I told them that I was in the Fentress County jailhouse—jail room this morning in the sheriff's department, and they wanted to know what was said down there.

> Now, I didn't say anything about nothing about [sic] being said or discussed or anything like that, you know. I said, you know, I was down there and I don't guess I— I said, I should have not been down there, but I said, I didn't know I wasn't supposed to be down there.

When defense counsel asked Baz what he said to the other jurors after being questioned by the trial court regarding his conversation with Det. Ledbetter, he stated:

> I just told [the other jurors], I said, "Evidently, I was not supposed to be at the sheriff's department this morning," and I said, "I didn't know that," and I said, Mr. Joe, I said, "Evidently, when [Gunter] came through he saw me, and he told his attorney that I was down there and [he] probably wanted to know why I was down there." And I said, "I didn't know I wasn't supposed to be down there." I said, "The guys are my friends at the Fentress County sheriff's department. I deal with them [because of my job with the telephone company] through the phone, office, through the fire department," and I said, "I just didn't know I wasn't supposed to be there at that particular time. But if I've caused a problem, I apologize and I'll be glad to step down, if you think that I'll hurt your case in some way."

The court excused Baz from the jury. Defense counsel then moved for a mistrial. The State acknowledged that the jury could have reached the conclusion from Baz's comments that Gunter was in custody; however, the State said that the jury had already heard testimony that Gunter had originally been arrested for violating his probation, so the jury may have already inferred that Gunter was in custody. The State suggested that the trial court give a curative instruction to the jury before granting a mistrial. Defense counsel stated that he was more concerned that the jurors would believe that he was "causing some problems" because Gunter saw Baz talking to Det. Ledbetter.

The trial court stated that it was "not going to assume prejudice" to the other jurors, and added:

> What I'm inclined to do is talk with this Jury, bring them in here, put it on the record, go through a curative instruction, and then think: Mistrial, under advisement. Let's just keep this thing going, and I can grant a mistrial before we ever start deliberation, if I thought it was appropriate, but I'm—and you know, at this—I don't know what's going to come up in the proof.

The court asked defense counsel if he wanted the jury to be instructed that "whether [Gunter's] residing at home, at an uncle's house or in the county jail doesn't matter as far as this trial is concerned." Defense counsel said that such an instruction "would be appropriate."

The trial court gave the jury curative instructions. First, the court reminded the jury that they are not to discuss the case with anyone. Second, the court told the jury to "avoid the appearance of impropriety" by "avoid[ing] any contact with anyone you don't have to talk

to[.]" Third, the court talked about the fact that Baz was removed from the jury:

> And I want you to understand also that the reason that Mr. Baz was excused was not necessarily because of one or the other party making the request. This court conducted the inquiry. I asked the questions, I decided on my own, you know, after discussion with counsel that Mr. Baz should be excused. So any—please don't infer that one or the other side of this case had Mr. Baz thrown out because they weren't happy with him. That's just not how it happened. I felt like it was appropriate to let him go . . . .

> Any communication that Mr. Baz had with you concerning the inquiry, you're not to consider that. . . .

> Please remember, you're going to try this case based on the evidence. You're going to hear the proof, you've seen all these exhibits come in, and that's how you should make your decision, not necessarily what you hear extraneous[ly].

The court told the jury that it was going to try to avoid "a situation where we've got to call on a hotel and put you up for a while. . . . I think we can do this case without holding you up and keeping you away from everything you need to be doing[.]" Finally the trial court emphasized that "where [Gunter] resides is of no consequence to this trial. Whether or not he's living with a family member, if he were in—you know, staying in a hotel, in the county jail, wherever it is, please understand, that is of no consequence to this case. . . ." The jurors indicated that they understood the court's instructions.

During the motion for a new trial hearing, defense counsel explained why he was requesting a new trial based on Mr. Baz's removal from the jury:

> [Defense Counsel]: [W]hat our point here is, is that . . . the jury knew who had brought up the issue, who as [sic] raising the issue and as a result of that, one of their own had been kicked off the jury and that if anything else like that happened, they were gonna have some grave consequences.

> . . . .

> [Defense Counsel]: Now, you know, . . . the problem from where we're sitting is that [it] all turns into our fault somehow. We raised it. And what we're concerned about is that the jury would transfer—you know, I don't think [there is] anybody sitting in the jury box feeling bad at the judge over a ruling or over things like that, but they know who was causing the problem. . . .

The trial court then responded, "I don't think there is anything else [that] could [have been] done in any way, and I don't find that there is any prejudice by Mr. Baz's situation."

*Gunter II*, at *4–6 (some alterations in original).

The appellate court then addressed Gunter's claim on direct appeal that he had been prejudiced

by the court's handling of the Baz situation as follows:

> A defendant's right to a fair trial is guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 9 of the Tennessee Constitution. . . .

> . . . .

> In this case, the jury was not sequestered. This court has previously established the appropriate standard for a jury that is not sequestered:

> When the jury is not sequestered, the defendant has the burden of showing something more than mere interactions between the jury and third persons. The defendant must instead establish that as the result of a juror's contact with a third person some extraneous prejudicial information, fact or opinion was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors.
>
> Here, . . . [s]ince the jury was not sequestered, the proper question regarding Baz is whether he imparted extraneous prejudicial information obtained from Det. Ledbetter to one or more of the jurors. The record shows that although Baz did have improper contact with Det. Ledbetter, it does not show that Baz actually received extraneous prejudicial information from this contact. . . . Accordingly, we conclude that Gunter is not entitled to relief on this issue.

*Id.* at *8–9 (internal citations omitted).

The trial court's statement that there was nothing else that could have been done about the situation strongly indicates that the court would have rejected any further efforts by counsel to push the issue. The appellate court concluded that Gunter failed to show prejudice arising from the Baz incident. Again, Baz's testimony in court was under oath (*see* Trial Tr. at 386, ECF No. 34-4, at 111), and Baz affirmatively stated that he did not have any substantive conversation with Detective Ledbetter about trial matters and that he did not relate any prejudicial information derived from his conversation with Ledbetter to the other jurors. Hypothetically, even if Baz learned information he was not supposed to have from Ledbetter, Baz was excused as a juror, thus obviating any need either to question him further or to question Ledbetter about the exchange. Moreover, defense counsel requested and the trial court provided a broad curative instruction to the jury, admonishing the jury not to draw any inference from the fact that Baz was removed from the jury, that where Gunter resided was completely irrelevant, and that they should make their decision based only on the evidence presented at trial.

"[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Moreover, A jury is normally presumed to "follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S.756, 766 n.8 (1987) (internal quotation marks and citations omitted.). Here, Baz testified under oath regarding what he had told the jury, and the record does not suggest that either the court or the parties had any reason to disbelieve his testimony. Gunter's claim that his attorney should have insisted on questioning the jury about what Baz said is based entirely on unwarranted speculation that Baz was

not truthful. Moreover, the curative instructions given by the court were adequate to prevent any potential prejudice. Gunter offers no reason to believe that the jury was unable to obey the trial court's curative instruction, and there is no evidence that Baz relayed any information to other jury members that had the potential to be "devastating" to Gunter's case. *Id.* And finally, the evidence against Gunter was strong, which simply reinforces the conclusion that Gunter was not prejudiced by the Baz incident itself, by his attorney's handling of the Baz incident, or by post-conviction counsel's failure to pursue an ineffective-assistance claim arising from trial counsel's handling of the incident.

In sum, even if post-conviction counsel was ineffective for failing to raise these issues in the initial-review collateral proceedings, Gunter cannot show that, but for counsel's error, the result of the post-conviction proceedings would have been different. The Court therefore finds that the petitioner is not entitled to relief on the basis of this issue.

## VI.    CONCLUSION

For the reasons set forth herein, Joseph Gunter's petition under § 2254 will be denied and this matter dismissed with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[A] COA does not require a showing that the appeal will succeed." *Miller-El*, 537 U.S. at 337. Courts should not issue a COA as a matter of course. *Id.*

In this case, the petitioner has not made a substantial showing of the denial of a constitutional right in ground one (that counsel was ineffective for failing to move to sequester the jury) or two (that counsel was ineffective for failing to seek forensic testing of blood on the petitioner's clothes). Ground

three (failure to seek forensic testing of fingerprints) was procedurally defaulted at the appellate post-conviction level, and the petitioner has not established any basis for overcoming the default. Ground four is plainly without merit, because the evidence was clearly sufficient to support the verdict. Moreover, although the Sixth Circuit has not provided guidance as to how to apply *Martinez*, the Court finds that the claims aggregated in ground five do not merit a COA, because the issue concerning juror Baz was thoroughly considered on direct appeal, and the petitioner cannot establish any prejudice arising from his post-conviction counsel's or trial counsel's treatment of the juror-misconduct issue.

Because an appeal by the petitioner on any of the issues raised in this petition would not merit further attention, the Court will deny a COA. The petitioner may, however, seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.

_____

Kevin H. Sharp
United States District Judge